**[J-65-2022] [MO: Donohue, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| ALLEGHENY REPRODUCTIVE HEALTH CENTER, ALLENTOWN WOMEN'S CENTER, DELAWARE COUNTY WOMEN'S CENTER, PHILADELPHIA WOMEN'S CENTER, PLANNED PARENTHOOD KEYSTONE, PLANNED PARENTHOOD SOUTHEASTERN PENNSYLVANIA, AND PLANNED PARENTHOOD OF WESTERN PENNSYLVANIA, | : : : : : : : : : : | No. 26 MAP 2021<br><br>Appeal from the Orders of the Commonwealth Court at No. 26 MD 2019 dated January 28, 2020, and March 26, 2021.<br><br>ARGUED: October 26, 2022 |
| Appellants | : : : : : : | |
| v. | : : : : : | |
| PENNSYLVANIA DEPARTMENT OF HUMAN SERVICES, VALERIE A. ARKOOSH, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE PENNSYLVANIA DEPARTMENT OF HUMAN SERVICES, ANDREW BARNES, IN HIS OFFICIAL CAPACITY AS EXECUTIVE DEPUTY SECRETARY FOR THE PENNSYLVANIA DEPARTMENT OF HUMAN SERVICES' OFFICE OF MEDICAL ASSISTANCE PROGRAMS, AND SALLY KOZAK, IN HER OFFICIAL CAPACITY AS DEPUTY SECRETARY FOR THE PENNSYLVANIA DEPARTMENT OF HUMAN SERVICES' OFFICE OF MEDICAL ASSISTANCE PROGRAMS, | : : : : : : : : : : : : : : : : : : : | |
| Appellees | : : | |

**CONCURRING AND DISSENTING OPINION**

**JUSTICE MUNDY**                                      **DECIDED: January 29, 2024**

# I. Stare Decisis

This case is not about anyone's right to obtain an abortion. It is about an alleged right to obtain *taxpayer money* to pay for it. We decided this issue in *Fischer v. Department of Public Welfare*, 502 A.2d 114 (Pa. 1985), and ruled unanimously that there is no state constitutional right to public funding for abortions. Notwithstanding our ordinary adherence to precedent, abortion providers (Plaintiffs) now ask this Court to overrule that unanimous decision, presumably because the composition of the Court has changed. I join Chief Justice Todd's thoughtful concurring and dissenting opinion to the extent it concludes the limited exception to *stare decisis* is not implicated in this case.[1]

Plaintiffs disagree with *Fischer* but their contention that *Fischer* is so deeply flawed as to warrant overruling is exaggerated at best. Plaintiffs mainly seem to want to re-argue the same points put forward, and rejected, in *Fischer* – *e.g.*, that the decision in *Cerra v. East Stroudsburg Area School District*, 299 A.2d 277 (Pa. 1973), supports their position. *See* Brief at 35-36. *Fischer* used straightforward logic to assess the way medicine necessarily treats men and women differently in the arena of childbearing due to their biological differences. This reasoning is not unsound, nor has it been rendered obsolete by legal developments since *Fischer*. "As the United States Supreme Court recently stated, 'To reverse a decision, we demand a special justification, over and above the

---

[1] The two threshold issues are standing by Plaintiffs and intervention by the legislative defendants. I agree with my colleagues that Plaintiffs have standing.

In relation to the Commonwealth Court's ruling allowing the legislative parties to intervene as additional defendants, I would hold that that tribunal acted within its discretion. In these unusual circumstances, participation by the legislative parties is especially needed for the sake of a fair process, or at least the appearance of a fair process, because the only other party supporting the government's interest in this matter – the Department of Human Services – is on record stating the executive branch disagrees with the underlying legislative policy. *See* Brief for Appellee Department of Human Services at 22. This is notable because the government's entire task on remand is to defend the very policy it disagrees with as that policy undergoes the strictest form of judicial scrutiny.

belief that the precedent was wrongly decided.'" *Commonwealth v. Alexander*, 243 A.3d 177, 196 (Pa. 2020) (quoting *Allen v. Cooper*, 140 S. Ct. 994, 1003 (2020)).

No "special justification" exists here for overruling the unanimous holding of this Court on the same claims simply because 38 years have passed since *Fischer* was decided and Plaintiffs disagree with *Fischer*. Yet, the majority overrules unanimous precedent on this politically sensitive topic which is best resolved by the political branches.[2] In so doing, it relies on the proposition that *stare decisis* is weakest in the constitutional arena. *See* Majority Op. at 54, 116, 213. But as the majority recognizes, that principle is based on the Legislature's inability to correct judicial errors in relation to such matters. *See id*. at 212 (quoting *Alexander*, 243 A.3d at 197); *accord Veith v. Jubelirer*, 541 U.S. 267, 305 (2004) ("[T]he claims of *stare decisis* are at their weakest in that field, where our mistakes cannot be corrected by Congress.") (citing *Payne v. Tennessee*, 501 U.S. 808, 828 (1991)). The *stare-decisis*-is-weakest precept is itself weakest where, as here, the prior interpretation gave the legislative branch *more latitude* to craft legislation pursuant to its own policy determinations, not less. Nothing in *Fischer* prevents the General Assembly from passing legislation favorable to Plaintiffs, and thus, any supposed error in our prior interpretation is of little relevance to the *stare decisis* precept relied on by the majority.

Additionally, I ultimately do not find Plaintiffs' merits arguments persuasive. In their petition for review, Plaintiffs raised two counts. In Count I, they claimed the coverage exclusion violates the Equal Rights Amendment (ERA). *See* PA. CONST. art. I, § 28 (1971) (prohibiting government discrimination based on sex). In Count II, they claimed it violates equal protection. *See* PA. CONST. art. I, §§ 1, 26 (respectively acknowledging the inherent rights of life, liberty, property, and reputation, and prohibiting discrimination in the exercise

---

[2] It may be observed that in this matter three Justices are overruling seven Justices.

of civil rights), and PA. CONST. art. III, § 32 (prohibiting local or special laws).  These two causes of action are addressed below, as is the effect on this case of *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), the Supreme Court's recent decision overruling *Roe v. Wade*, 410 U.S. 113 (1973).  Finally, I elaborate on why this case is only about funding, and not about the infringement of a fundamental right.

## II. Merits

### A. Count I – The Equal Rights Amendment (ERA)

Pennsylvania's Equal Rights Amendment prohibits sex-based discrimination by the Commonwealth.  *See* PA. CONST. art. I, § 28 (1971).  But it a stretch to argue the coverage exclusion constitutes discrimination based on sex.  The exclusion does not distinguish between men and women, but between two groups of women:  those who choose childbirth and those who choose abortion.  Although it is true that only women can become pregnant and have to make that choice about their own health care, that is not a result of the coverage exclusion, it the result of biology, and it is one of the factors that makes men and women non-interchangeable:

> The mere fact that only women are affected by this statute does not necessarily mean that women are being discriminated against on the basis of sex.  In this world there are certain immutable facts of life which no amount of legislation may change.  As a consequence there are certain laws which necessarily will only affect one sex.

*Fischer*, 502 A.2d at 125.

Ultimately there is simply no reference point pertaining to men from which to argue the coverage exclusion, relating exclusively to pregnancy, treats men as a class more favorably than women so as to bring it within the scope of the ERA.  Plaintiffs attempt to suggest one, proposing that Medical Assistance (MA) would discriminate against men if it covered treatments for uterine cancer but not prostate cancer.  *See* Brief at 35-36.  But

both of those treatments involve cancer, which either sex can get. The challenged exclusion here is qualitatively different as it deals only with pregnancy and funds one pregnancy outcome but not another – based on a legitimate governmental interest. Plaintiffs' two-types-of-cancer hypothetical is thus inapt. It would be more appropriate to identify a medical condition unique to men which has two treatment options, one that enhances fertility and the other that reduces it. If the Commonwealth made public funds available only for the first option, it would be difficult to conclude men were thereby being treated *worse than women*. That would be a *non-sequitur*.[3]

But this appears to be what Plaintiffs are arguing: that funding pregnancy care leading to birth while not funding abortions *treats women worse than men*. And with the coverage exclusion here at issue, the state is on solider ground than in the above example because it serves the state's recognized interest in protecting the already-extant biological life of the fetus – sometimes referred to a bit awkwardly as "potential life." *Cf. Commonwealth v. Bullock*, 913 A.2d 207, 213 (Pa. 2006) ("[T]o accept that a fetus is not biologically alive until it can survive outside of the womb would be illogical."). Even during an era when there was a federally-guaranteed right to abortion under *Roe v. Wade*, 410 U.S. 113 (1973), the United States Supreme Court recognized that a state's interest in

---

[3] In a footnote the majority recasts Plaintiffs' ERA claim by suggesting that the actual sex-based discrimination reflected in the coverage exclusion follows from the circumstance that all male reproductive health procedures are allegedly covered, whereas not all female ones are. *See* Majority Op. at 84 n.49 (citing Petition for Review at ¶ 54). If that were truly the substance of the complaint, the General Assembly could resolve it simply by terminating coverage for one randomly-selected male procedure, and then supposedly Plaintiffs' entire ERA claim would evaporate. Clearly, that is not what Plaintiffs are arguing. The gravamen of their complaint is that MA covers childbirth but not abortion. This is reflected by, *inter alia*, their argumentative allegation contained in the ERA count itself proposing that the coverage exclusion violates the ERA because it "reinforces gender stereotypes about the primacy of women's reproductive function and the maternal role." Petition for Review at ¶ 91. As noted, subsidizing one pregnancy outcome but not another is plainly *not* a sex-based distinction.

protecting fetal life was significant and that it subsisted throughout pregnancy. Thus, even in that timeframe states were permitted to take steps to further their legitimate interest in encouraging childbirth. *See Beal v. Doe*, 432 U.S. 438, 446 (1976). Recognizing they have no federal claim, then, Plaintiffs presently advance a *non-sequitur* under the state charter which the majority endorses on the false premise that the coverage exclusion comprises a sex-based distinction. The premise is false because the coverage exclusion does not "differentiate on the basis of gender" – a necessary feature of a sex-based distinction. *Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017); *accord Dobbs*, 142 S. Ct. at 2245 (observing that "a State's regulation of abortion is not a sex-based classification").

Plaintiffs also go to some length to characterize the coverage exclusion as violating the ERA on the basis it perpetuates outdated stereotypes about women and childbearing. They contend pregnancy has historically been invoked to support unfavorable treatment of women in other contexts such as property ownership or property division in a divorce. It is true that this Court has invalidated several statutes and common law doctrines based on gender-based stereotypes.[4] But unlike this case, those matters involved situations

---

[4] For example: the Adoption Act's failure to require parental consent of unwed fathers as well as unwed mothers; the presumption where a husband obtains his wife's property without adequate consideration, that a trust is created in his wife's favor; the doctrine of "coverture" requiring a presumption that a wife who commits a crime in her husband's presence was coerced by her husband; the presumption that a husband is the owner of household goods used and possessed by both spouses; a statutory scheme under which women were eligible for parole immediately upon incarceration while men had to serve a minimum sentence; a statute providing for alimony *pendente lite*, counsel fees, and expenses in a divorce action for the wife but not for the husband; the presumption that a father must bear the principal burden to support minor children; the presumption that the husband could recover for loss of consortium but the wife could not; the tender years doctrine which created a presumption requiring the father to overcome its effects; and unequal automobile insurance rates based on gender. *See Hartford Acc. & Indem Co. v. Ins. Comm'r*, 482 A.2d 542, 548 (Pa. 1984).

where the two sexes were otherwise able to perform the same task, which is not true with pregnancy and childbirth.

Plaintiffs rely largely on ideological expressions contained in law review articles. *See* Brief at 35-40. The actual legal authority they present is sparse and their analysis fails to account for *Fischer*'s observation that the legislative distinction being drawn here is not between the sexes, but between the different outcomes of an existing pregnancy – again, in service of the state's important interest in promoting maternal health and protecting fetal life from destruction. *See* Senate Intervenors' Brief at 30 (noting the coverage exclusion "does not focus on the *condition* of pregnancy, but on the *act* of abortion"); *accord Bell v. Low Income Women of Tex.*, 95 S.W.3d 253, 258 (Tex. 2002) ("The classification here is not so much directed at women as a class as it is abortion as a medical treatment, which, because it involves a potential life, has no parallel as a treatment method."). As the Supreme Court has recognized, "[a]bortion is inherently different from other medical procedures, because no other procedure involves the purposeful termination of a potential life." *Harris v. McRae*, 448 U.S. 297, 325 (1980).

Plaintiffs additionally interpret the coverage exclusion as expressing official disapproval of women who reject the maternal role, which would run counter to the ERA's promise of equal treatment of the sexes. *See* Brief at 40. It is more accurate to say that, via financial incentives, the state encourages pregnant women to choose childbirth over abortion. While that type of incentive structure may be construed by some to carry an implicit disapproval of the non-subsidized option, any such disapproval would stem from the state's interest in protecting life, not from an intent to scorn women who elect against the maternal role. It therefore does not support the concept that the state is promoting an outdated gender-based stereotype.

Ultimately, Plaintiffs' position in this litigation is substantially weakened because, as explained above, abortion rights are not at stake, solely the ability to receive public money to pay for abortions.[5]  And in their brief to this Court, the harm Plaintiffs describe as a basis for their standing to bring this action is not that their patients are in danger of losing that legal right, but that they (Plaintiffs) must expend time and effort securing private funding for the abortions at issue, time and effort they would prefer to spend on other endeavors, and that they must also spend some time discussing financial matters with their patients instead of being able to limit those discussions to medical issues.  *See* Brief at 14-15.

Yet, despite all this, the plurality today would create an entirely new constitutional doctrine out of whole cloth, christening it "reproductive autonomy," which does not appear anywhere in the Pennsylvania Constitution's text or history.[6]  The majority then overrules

_____

[5] It is undisputed that Plaintiffs' low-income patients can and often do receive private funding.  Plaintiffs themselves allege that this is true in their petition for review.

[6] While "autonomy" – literally meaning a law unto oneself or having one's own laws – may be attractive to some as a policy matter, this case calls for an exercise in constitutional interpretation, not social policy creation.  The words "reproductive" and "autonomy" do not appear in the text of the Pennsylvania Constitution, either expressly or by necessary implication.  And the history of abortion regulations in this jurisdiction belies the concept that the people of this Commonwealth have displaced the Legislature by constitutionalizing the life and health issues that inevitably arise in connection with a decision to abort a living human fetus.  *See infra* note 11.

The plurality mischaracterizes the above as "hyperbole" and then slays a straw man by suggesting I might question the right of privacy given that the word "privacy" does not appear in the text of our Charter.  Majority Op. at 136 n.100 (plurality in relevant part).  This ignores the "necessary implication" facet of the above.  As I have emphasized, moreover, the present controversy is not about the right to choose abortion, it is about whether taxpayers should be forced to subsidize that choice against their will as expressed by their elected representatives.  The difference between governmental intrusions upon privacy rights and the funding dispute raised by the instant case is made clear by the fact that, even when *Roe* was in force – and long after privacy was enshrined (continued…)

a unanimous decision of this Court that is directly on point, and markedly erodes the authority of a co-equal branch of government to balance competing public policy concerns and make judgments by its own lights.[7]

---

beyond question in the constitution at both the state and federal levels – the coverage exclusion survived constitutional scrutiny as did its federal counterpart, the Hyde Amendment. The plurality's further claim that it is acting consistently with centuries of this Court's jurisprudence is belied by our unanimous decision in *Fischer*.

[7] I agree with the majority that the ERA applies to individuals. *See* Majority Op. at 85 n.51. But in making that observation the majority emphasizes what is not in dispute. The ERA provides in full: "Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual." PA. CONST. art. I, § 28. The operative terms are "equality," "denied or abridged," and "because of the [person's] sex." My point is that, to the extent the coverage exclusion treats some women differently than others, it is not "because of their sex" but because of their actions. And this is putting aside that the exclusion does not "deny or abridge" anyone's rights, as it does not interfere in any way with a woman's right to obtain an abortion.

The majority also fails to give a satisfactory account of the word "equality," a term that necessarily involves a comparison – which in turn raises the question, equal to what? In light of the clarifying phrase "because of the [person's] sex," the obvious answer is *the other sex*. All of our ERA cases have recognized this. *See, e.g., Commonwealth v. Butler*, 328 A.2d 851, 855 (Pa. 1974); *see also* Majority Op. at 94-98 (summarizing cases). Even in *Cerra v. East Stroudsburg Area School District*, 299 A.2d 277 (Pa. 1973), the case on which the majority places heaviest reliance, we reasoned that under the challenged rule "[m]ale teachers, who might well be temporarily disabled from a multitude of illnesses, have not and will not be so harshly treated. . . . This is sex discrimination pure and simple." *Id*. at 280, *quoted in* Majority Op. at 97.

Accounting for the meaning of "equality" is necessary to a correct application of the ERA because, by its terms, the ERA prohibits the abridgement, not of rights as such, but of the equality of rights. The majority confuses the connotation of the term "equality" by suggesting it means the government may not "withhold the enjoyment" of a person's rights. Majority Op. at 84. State action withholding the enjoyment of certain rights may indeed be unconstitutional, but it does not violate *the ERA* unless it withholds that enjoyment "because of the [person's] sex" – which the coverage exclusion does not do: first, because it does not "withhold the enjoyment" of any rights from anyone, and second, because it does not make any sex-based distinction.

**B. Count II – Equal Protection**

With regard to equal protection, Plaintiffs' core position is that, if the state funds health care relating to pregnancy, it must do so evenhandedly by funding abortions too. Relying on Article I, Sections 1 and 26, and Article III, Section 32, they argue strict scrutiny applies to the legislative distinction between abortion and childbirth because abortion, being based on privacy, is a fundamental right which is burdened by that distinction. They use language suggesting the state is acting in a coercive manner by invading women's "bodily integrity" and in blocking low-income women from obtaining the care they need. They criticize *Fischer* for casting the right at issue as the right to state-funded abortions, whereas in reality, they argue, it is the right to equal treatment of constitutionally-protected choices.[8]

Initially, Article III, Section 32 is irrelevant. That provision prohibits special or local laws in any case that can be provided for by general law, and it precludes special laws on certain enumerated topics such as the regulation of school districts. However, the Abortion Control Act is not a special law. It is a general law because it creates classifications that are "not 'closed,' but open for new members to come in." *Harrisburg Sch. Dist. v. Zogby*, 828 A.2d 1079, 1091 (Pa. 2003). Its classifications are women enrolled in MA who choose childbirth, and women enrolled in MA who choose abortion. These are not closed classes. Although in some contexts Section 32 has been viewed as one pillar of the equal protection guarantee under the state Charter, this is not one of them because, again, this is not a challenge to a special law.

---

[8] Plaintiffs again use an analogy to illustrate their point. They note the state need not subsidize voter transportation to the polls, but if it elects to do so it cannot solely subsidize transportation for registered Democrats but not registered Republicans. *See* Brief at 57 n.30. This hypothetical is discussed below.

That leaves Article I, Sections 1 and 26. Equal protection under those provisions has generally been deemed coterminous with the Equal Protection Clause of the Fourteenth Amendment. The analysis uses the same framework by discerning the level of judicial scrutiny and then assessing whether the legislative classification survives such scrutiny. *See Love v. Borough of Stroudsburg*, 597 A.2d 1137, 1139 (Pa. 1991). To discern what level of scrutiny to apply, courts ask what legislative classification has been made, and what interests if any are infringed by it. Just as being able to frame the terms of a debate gives one an advantage, both sides here seek to frame the classifications and the interests at issue in terms that favor their position. The legislative intervenors focus on the funding aspect of the dispute and note indigency is not a suspect classification, whereas Plaintiffs argue abortion and bodily autonomy are fundamental rights and suggest the state is acting coercively. They frame the issue as "the right to equal treatment of constitutionally-protected choices." Brief at 72.

Identifying the classification here is aided by Plaintiffs' subsidized-transportation example. *See supra* note 8. Plaintiffs offer that the state need not subsidize voter transportation to the polls, but if it elects to do so it cannot solely subsidize transportation for registered Democrats but not registered Republicans. *See* Brief at 57 n.30. Although the analogy is ultimately off point, as the state lacks a valid interest to favor electoral participation by only one political party, whereas it does have a valid interest in protecting fetal life, the example still highlights that the real classification is not indigent versus non-indigent women (since the government does not subsidize abortion for either group), but *MA-enrolled pregnant women who choose childbirth* versus *MA-enrolled pregnant women who choose abortion*.[9] By the same token, the alleged interest at stake is not

---

[9] As discussed in Part III below, even this rendering is imprecise because the coverage exclusion does not treat *persons* differently, it treats their *actions* differently.

solely public funding for abortion, but the *right to public funding of abortion when public funds are made available for childbirth*. Plaintiffs do not provide any legal authority to substantiate that this conditional right – or that their suggested freestanding right to "equal [funding] of constitutionally-protected choices," Brief at 72 – even exists, let alone is a fundamental one. The right and classification reflected in the emphasized text above are two sides of the same coin, and there is no authority to support that either one triggers strict or intermediate scrutiny.[10] That being the case, the rational-basis standard is implicated here, and so the question becomes whether the classification is rationally related to a legitimate state interest.

The question answers itself, and it was answered in *Fischer*. There is little dispute that MA-enrolled women who choose abortion and MA-enrolled women who choose childbirth are not similarly situated. They have different needs, and by their choices they actively promote, or actively impede, the government's interest in protecting fetal life, which is undoubtedly an important one. *See Fischer*, 502 A.2d at 122 ("[T]o say that the Commonwealth's interest in attempting to preserve a potential life is not important, is to fly in the face of our own existence"). *See generally Zogby*, 828 A.2d at 1088 (explaining that equal protection does not preclude differential treatment of persons having different needs; the Legislature retains the power to classify, which flows from its general power to enact regulations for the health, safety, and welfare of the community). The General Assembly may choose to fund one but not the other because it retains discretion to allocate the finite social welfare resources of this Commonwealth according to its legitimate aims. In so doing, providing funding to encourage women to choose childbirth

---

[10] Suspect classes are race and national origin, and, for purposes of state (as opposed to federal) laws, alienage. Quasi-suspect classes (sensitive classifications) are gender and legitimacy. *See Small v. Horn*, 722 A.2d 664, 672 & nn.14-15 (Pa. 1998) (citing cases).

and to help effectuate that choice, while also declining to provide funding to facilitate abortions, is rationally related to the state's legitimate interest in protecting life.

## C. Effect of *Dobbs*

*Fischer* was decided in an era when *Roe* was still in force. In that era abortion rights were protected by the United States Constitution. By the time *Fischer* was decided, twelve years after *Roe*, many of the issues raised here had been addressed and resolved by the United States Supreme Court in terms of the leeway afforded states by the federal Constitution. Thus, in *Fischer* we observed that, per the Supreme Court, a state's interest in fetal life was significant and continued throughout pregnancy. States could therefore take steps to further their legitimate interest in encouraging childbirth. *See Fischer*, 502 A.2d at 118 (quoting *Beal*, 432 U.S. at 446). There was no requirement for states to accord equal treatment to abortion and childbirth, and thus, a state could pay the expenses of childbirth while declining to pay for most abortions. *See id*. (quoting *Maher v. Roe*, 432 U.S. 464, 470 (1977)). Further, while the right under *Roe* protected women from state actions that unduly burdened their freedom to terminate a pregnancy, it implied no limitation on the authority of the government to make a value judgment favoring childbirth over abortion, or to implement that judgment through its allocation of public funds. *See id*. (quoting *Maher*, 432 U.S. at 473-74). As a consequence, Congress could lawfully limit the funding of abortions to life-threatening situations and/or to medically-necessary abortions in pursuing a policy to encourage childbirth. *See id*. (citing *Harris v. McRae*, 448 U.S. 297 (1980); *Williams v. Zbaraz*, 448 U.S. 358 (1980)).

We explained further that the Supreme Court's decision in *Harris* dealt with the Hyde Amendment, which was challenged on due-process and equal-protection grounds. As for due process, *Harris* held that: although a state forcibly interfering with abortion may violate due process, a state merely encouraging an alternative to abortion in the

public interest does not. Freedom to choose abortion thus does not equate to a right to receive public funding for that choice. As well, if a woman is indigent, the government is not obligated to remove obstacles not of its own making. *See id*. at 119 (relying on *Harris*, 448 U.S. at 316-17).

Finally, regarding equal protection, we noted that the Supreme Court had ruled that: indigency is not a suspect class, and therefore rational-basis is the test to use; disparate impact on low-income women is not relevant to the analysis; and the Hyde Amendment is rationally related to the legitimate government interest in protecting fetal life. *See id*. at 119-20 (citing *Harris*, 448 U.S. at 323-25).

That was the state of the law when *Roe* was in force. At this juncture, *Roe* is no longer in force, *see Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), and state legislatures now have greater flexibility under the federal Constitution to enact abortion regulations than they did before. That being the case, the principles underlying *Fischer* as summarized above continue *a fortiori*. Nonetheless, in view of the sea change accomplished by *Dobbs*, we permitted the parties to file supplemental briefs addressing what impact, in their view, *Dobbs* should be seen as having on this case.

Plaintiffs argue *Dobbs* has nothing to do with this litigation and, if anything, it highlights that the Pennsylvania Constitution's protection of reproductive rights is separate from and more robust than the protection under the federal Constitution. They also point to an executive order by former Governor Wolf, issued post-*Dobbs*, reflecting his view that the Pennsylvania Constitution protects abortion rights. Plaintiffs offer a policy argument: since the United States Constitution no longer protects abortion rights, it is that much more important for this Court to do so. This then becomes the basis for a legal argument that *Dobbs* comprises a "special justification" to revisit *Fischer*. Further, although *Dobbs* contains language indicating there is no federal Equal Protection Clause-

based right to an abortion because abortion restrictions do not constitute a sex-based classification, *see Dobbs*, 142 S. Ct. at 2245-46, Plaintiffs characterize that language as *dicta* that does not apply under the Pennsylvania Constitution.

For its part, the Department of Human Services argues *Dobbs* changes nothing. It stresses that the narrow issue here is abortion subsidization, not abortion rights. The Department highlights that Plaintiffs do not contend there is a fundamental right to a state-funded abortion.

The Senate intervenors express that *Dobbs* is the most significant abortion-related decision in fifty years, but it has nothing to do with abortion funding, which is within the General Assembly's exclusive purview under Article II, Section 1, which vests legislative power in the General Assembly, and Article III, Section 34, which states no money shall be paid out of the treasury, except on appropriations made by law. They stress that equal protection under the Pennsylvania Constitution has long been viewed as coterminous with the Fourteenth Amendment, and hence, *Dobbs* does not bolster Plaintiffs' position that *Fischer* should be overturned – especially insofar as *Dobbs* expressly rejected an equal-protection-based sex discrimination claim in relation to abortion restrictions. They assert that, since there are now no federal constitutional limits on a state's authority to regulate abortion, Plaintiffs' equal protection claim is less tenable than before *Dobbs* and so it is less, not more, appropriate to revisit *Fischer*. This Court should not "take Plaintiffs' bait," they continue, and use this case to address the right to abortion in Pennsylvania. They reason, as to both counts of the petition for review, that the coverage exclusion does not treat women differently than men: it treats two categories of women differently – those who terminate their pregnancy and those who carry it to term. This type of distinction, they maintain, does not trigger heightened scrutiny and it easily survives rational basis review.

The House intervenors agree with the above and add that the *Roe*-based right formed the backdrop to Pennsylvania abortion law, as no such right was ever original to the Pennsylvania Constitution and abortion has no historical roots in this Commonwealth. Unlike New York and California, they stress that this state never enacted laws protecting abortion; rather, Pennsylvania has enacted laws protecting a mother and her unborn child. *See, e.g.*, *Commonwealth v. Bullock*, 913 A.2d 207 (Pa. 2006) (upholding the constitutional validity of Pennsylvania's fetal homicide law). Now that the Supreme Court has returned "the authority to regulate abortion" "to the people and their elected [state] representatives," *Dobbs*, 142 S. Ct. at 2279, the House intervenors submit there can be no right to a taxpayer-funded abortion. They contend that at a minimum this Commonwealth has determined abortion is not an appropriate use of public funds, and that determination should remain in the legislative sphere. They argue once the Supreme Court recognized the lack of a federal abortion right it employed rational-basis review in evaluating the legislation challenged in *Dobbs*. They contend this Court should use that same level of scrutiny as well in evaluating the coverage exclusion.

*Dobbs* overturned *Roe* and held abortion is no longer a right protected under the United States Constitution. In my view, this development can only harm Plaintiffs' current litigation position because it removes one basis to claim that abortion is a fundamental right entitled to mandatory public funding equivalent to childbirth. Plaintiffs may argue that from a social policy standpoint this Court should fill the gap left by *Dobbs* and redouble its efforts to protect the abortion right, but that is an argument for the legislative arena. From a legal standpoint it is hard to see how *Dobbs* can strengthen Plaintiffs' position.

*Dobbs* returned abortion regulation to the states, and hence, the state Charter is now the primary basis for abortion providers and women seeking abortions to claim a

constitutional entitlement to public funding equivalent to that for childbirth. This development would be more beneficial to Plaintiffs if the abortion right was historically recognized as fundamental in Pennsylvania. But there is nothing in the history of this Commonwealth to that effect, notwithstanding that the right of privacy has always been enshrined in our state Constitution. *See, e.g.*, *Mills v. Commonwealth*, 13 Pa. 631, 633 (1850) (declaring abortion throughout pregnancy a crime in Pennsylvania, with no exception for the pre-"quickening" period of gestation).[11] Even after *Roe*, laws seeking

---

[11] It also bears noting that our charter was rewritten in 1874 after *Mills* was decided, and substantially rewritten again in the late 1960s when abortion liberalization was occurring in other jurisdictions. In both instances, and in the numerous amendments before and after *Fischer* and *Roe*, the people have not seen fit to add text protecting reproductive autonomy, or in any way directly relating to that concept or to abortion funding.

Additionally, while the plurality highlights the "monumental impact" on the woman making the abortion decision, an impact I do not deny, Majority Op. at 152 (plurality in relevant part), it gives little weight to the monumental impact the abortion decision has for the unborn child, who either lives or dies depending on the mother's choice – or to the legislative preference insofar as it is designed to promote the mother's physical and mental health. *See* 18 Pa.C.S. § 3202(a) (reflecting an intent to promote maternal life and health); *see also* Brief of Amici American Association of Pro-Life Obstetricians & Gynecologists, at 4-21 (detailing the adverse health effects of abortion); *McCorvey v. Hill*, 385 F.3d 846, 850-52 (5th Cir. 2004) (Jones, J., concurring) (summarizing evidence of record describing serious mental health issues in the post-abortive timeframe).

Nor does the plurality account for the impact of the decision on the fetus whose life is terminated or for the governmental interest in preserving that life. In dismissing all such concerns on the grounds that people's "views of morality may change," the examples cited by the lead Justices – such as those dealing with adultery and the like – are materially distinguishable as none involves the destruction of another extant human life that has undeniable value.

The plurality does not recognize this distinction, claiming instead it is "not constrained . . . to determine whether abortion is 'deeply rooted' in the 'history or traditions' of this Commonwealth." It then adds, inconsistently, that only the "text and history" of Article I, and the intent of the people adopting it, really matter. It gives as the reason that the (continued…)

to protect fetal life were passed in this Commonwealth when the abortion right itself was largely in the domain of the federal courts. *See* House Intervenors' Brief at 53 (listing laws, including the Crimes Against the Unborn Child Act, Newborn Protection Act (the safe haven or "baby Moses" law), elimination of the cause of action for wrongful birth or wrongful life, and barring the defense against a claim for injury sustained *in utero*).

Finally, to the extent bodily integrity, decisional autonomy, the right to be the "master of one's own fate," and similar ideological expressions forwarded by Plaintiffs, *see* Brief at 63; *see also* Majority Op. at 129, 137 (plurality in relevant part) (highlighting these concepts), can be seen as protected by the Pennsylvania Constitution, the government here is not infringing those rights. Those rights erect a shield against state

---

subject of abortion must be free of policy debates and of the "deeply held views on both sides" of the issue.

But those words are insufficient to conceal that in the plurality's reckoning, the "deeply held views" of only one side of the debate count. The plurality gives no persuasive explanation of *why* that is true, given that there is another life at issue – a circumstance the General Assembly certainly is allowed to take into account. *See Planned Parenthood of the Heartland v. Reynolds*, 975 N.W.2d 710, 740 (Iowa 2022) (finding the Iowa Constitution does not support abortion as a fundamental right in part because of "important interests – such as life itself – on both sides"). As illustrated by this case, moreover, those other lives are particularly vulnerable to destruction and have no voice of their own in the political process. They must therefore rely on others to be their voice, and there is little in the lead opinion to suggest it believes the General Assembly may attend at all to that surrogate voice.

Finally, it is worth noting that in their 219-page opinion, the lead Justices do not once concede those other lives have inherent value or that a choice to abort them necessarily involves their involuntary, violent destruction. *See* Brief for Amicus Democrats for Life of America, at 13 (discussing technological advances revealing that human fetuses feel pain, as well as scholarship indicating that "mainstream medicine now recognizes the fetus as a patient, capable of being treated and worthy of care"). Instead, they invoke euphemisms drawn from political ideology, such as "reproductive autonomy," "procreative choice," and "control of one's body" – without acknowledging there is another "body" in the equation that the Legislature may validly consider, or that adoption exists as an option for a pregnant woman to avoid expanding her family if she so chooses.

intrusion into one's body and one's private choices, but they do not entitle women seeking abortion to the same level of public funding as women pursuing childbirth.

### III. What this case is not about

As observed at the outset of this opinion, this case is not about a woman's right to choose abortion. It is about the use of taxpayer dollars to subsidize that choice.[12] Yet, the plurality would use this dispute to fabricate a fundamental right to reproductive autonomy as a stepping-stone to erecting an all-but-insuperable hurdle for the political branches to clear in fulfilling their core function to determine how best to allocate taxpayer funds in the public interest, consistent with their own judgments and determinations about the appropriate way to balance competing social policy objectives. *See* Majority Op. at 217 (plurality in relevant part) ("The state bears a heavy burden of justification[.]"). As reflected in the Abortion Control Act, the legislative branch, fulfilling that role, has already determined it would best serve the health, safety, and welfare of the citizens of this Commonwealth, including pregnant women, to structure the financial incentives created by public monies to encourage the bringing to term of a living human fetus. *See generally* 18 Pa.C.S. § 3202(a) (expressing legislative intent to protect the life and health of both the woman and the child subject to abortion). Today, the lead Justices would in essence override that legislative judgment, and, in doing so they would give no weight at all to the state's interest in accommodating the conscience of taxpayers with deeply-held beliefs opposed to abortion who do not want to be compelled to fund it. *See generally* Brief for

---

[12] It may be noted that Plaintiffs are not women seeking abortion, but abortion providers who stand to receive substantial public funds from a ruling in their favor. *See generally* Brief for Amici Nationally Recognized Organizations & Leaders in the Black Community, at 29 (describing this litigation as having been commenced by "the largest abortion businesses in Pennsylvania to fund elective abortions").

Amicus Democrats for Life of America, at 9-14 (discussing the history and social value of such legislative accommodations).[13]

Further, establishing the right to reproductive autonomy as both fundamental and of constitutional provenance is unnecessary to this case: even if one assumes it subsists as an inherent right, the Abortion Control Act does not penalize women for exercising it. *See McRae*, 448 U.S. at 317 n.19 (recognizing that the refusal to fund protected activity does not equate to the imposition of a penalty on that activity). To the contrary, it *leaves them alone*, opting not to grant them money or charge them money – which is the very basis for the right itself as the plurality conceives it. *See, e.g.*, Majority Op. at 147 (plurality in relevant part) (grounding the abortion decision in the right *to be let alone*). "There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." *Maher*, 432 U.S. at 475.

One may therefore wonder how the *right to be let alone* in making personal decisions can be transformed into the *right to receive taxpayer money* to fund one decision if the government funds a different decision. To justify this transformation, the plurality indicates that not receiving money amounts to "discriminating against [a] person in the exercise of a fundamental right[.]" Majority Op. at 217 (plurality in relevant part).

---

[13] In overriding the Legislature's judgment, the plurality would additionally set the stage for this Commonwealth to become bogged down in virtually limitless abortion litigation, as all aspects of Pennsylvania's abortion regulations are now certain to become subject to lengthy court proceedings in relatively short order. These include such measures as the required informed-consent counseling and 24-hour waiting period, *see* 18 Pa.C.S. § 3205; parental consent for minors, *see id*. § 3206; the prohibition on abortions performed after 24 weeks' gestation, *see id*. § 3211; the need to determine gestational age, *see id*. § 3210; the prohibition on feticide when an abortion fails, *see id*. § 3212; reporting requirements, *id*. § 3214; the prohibition on sex-selection abortions, *see id*. § 3204(c); limitations on abortions at public health facilities, *see id*. § 3215(c); limitations on abortions performed on an ambulatory basis, *see* 28 Pa. Code § 29.34, and clinic health and safety standards, *see id*. §§ 29.33, 29.43.

But this is wordplay. In reality, it is not discrimination against a *person*. It treats no *person* differently than any other. Each *person* faces the exact same conditions: in recognition of the public interest favoring childbirth – an interest that does not appear to be in dispute – the government subsidizes that person's *actions* only if she decides to bring her pregnancy to term. This is a far cry from discriminating against a person because of her sex, which, unlike her actions, she has no control over.

This type of financial incentive is hardly unique to pregnancy healthcare decisions. Freedom of speech is a fundamental right, but the government may subsidize some speech while not subsidizing other speech (such as political lobbying). *See Regan v. Taxation With Representation of Wash.*, 4611 U.S. 540, 549 (1983) ("We have held in several contexts that a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny."). This same principle allows the government to require educational institutions receiving federal monies, and their students, to execute an agreement promising to abide by federal anti-discrimination laws as a condition of receiving those monies. Such a requirement does not violate their First Amendment rights as they remain free to decline the funds and not execute the agreement. *See Grove City College v. Bell*, 465 U.S. 555, 575-76 (1984). Thus, when the government provides public funds, it may condition those funds on the recipient agreeing not to act contrary to the government's legitimate interests, even if the recipient has a fundamental, constitutionally-protected right to so act:

> The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In so doing, the Government has not discriminated . . .; it has merely chosen to fund one activity to the exclusion of the other.

*Rust v. Sullivan*, 500 U.S. 173, 193 (1991).[14]

In brief, what the majority overlooks is that there is a material difference between a *person* and her *actions*, and that the funding discrepancy here is not based on *who women are*, but on *what they do*. Moreover, the coverage exclusion works no more of an intrusion into a woman's personal decisions than if the General Assembly decided not to fund any pregnancy-related services at all – or if it decided that the best use of public funds was to subsidize pregnancy-related medical expenses above a certain dollar threshold, and that threshold happened to be greater than the cost of most abortions but less than the cost of medical care associated with bringing a pregnancy to term. As the Supreme Court has cogently explained:

---

[14] To take another example, some states recognize a fundamental right to private choice when selecting foods. *See* MAINE CONST. art. I, § 25 ("All individuals have a natural, inherent and unalienable right to food . . . including . . . the right to . . . consume the food of their own choosing[.]"). As with the abortion right, this interest has been cast as one facet of personal autonomy and the right of privacy. *See Farm-to-Consumer Legal Defense Fund v. Sebelius*, 734 F. Supp. 2d 668, 679-80 (N.D. Iowa 2010). *See generally* Kammi L. Rencher, *Food Choice & Fundamental Rights*, 12 NEV. L. J. 418 (2012). Under the lead opinion, it is plausible that if such a right were recognized in Pennsylvania, any state-funded nutrition-assistance program designed to assist low-income residents would be constitutionally suspect to the extent it was limited to healthy foods and did not apply to other, less healthy foods preferred by some program participants.

There is also a fundamental liberty interest in receiving or declining life-sustaining medical treatment. *See Cruzan by Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261 (1990). The lead opinion's conclusions would appear to mean that if the state subsidizes lifesaving medical treatment, it must equally subsidize the costs associated with a decision to die. In other words, the state cannot incentivize life over death.

Or consider yet another example: parents enjoy a fundamental right to direct the upbringing and education of their children. *See Pierce v. Society of Sisters*, 268 U.S. 510 (1925). Today's ruling could mean that if the state subsidizes parents' choice to send their children to public or private schools, it must also subsidize their choice to home school their children. *See Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). The list of examples is limited only by the imagination.

An indigent woman who desires an abortion suffers no disadvantage as a consequence of [a State's] decision to fund childbirth; she continues as before to be dependent on private sources for the service she desires. The State may have made childbirth a more attractive alternative, thereby influencing the woman's decision, but it has imposed no restriction on access to abortions that was not already there.

*Maher*, 432 U.S. at 474; *accord McRae*, 448 U.S. at 316 ("It simply does not follow that a woman's freedom of choice carries with it a constitutional entitlement to the financial resources to avail herself of the full range of protected choices.").

Finally, the majority's ill-considered ruling that Article I, Section 26 means that "the government must maintain a position of [funding] neutrality with regard to citizens' exercise of their constitutional rights," Majority Op. at 215-16, will have far-reaching and unintended consequences as it applies to all manner of governmental funding. Any number of pursuits involve the exercise of fundamental rights in one way or another, *see supra* note 14, and the Commonwealth's ability to subsidize some while not subsidizing others in the public interest is inherent to the legislative power as vested in the General Assembly by Article II, Section 1. *See Zogby*, 828 A.2d at 1088. Our previous explanation that Section 26 means citizens cannot "be harassed or punished for the exercise of their constitutional rights," *Fischer*, 502 A.2d at 123, was well-considered, restrained, and appropriate, as it preserved the delicate balance of power among the coequal branches while also protecting individuals from unjust legislative classifications, but it did not lead to the result the majority wants to reach in this case. The majority's substituted "neutrality" approach *as applied to the public funding arena* will assuredly prove destructive to that balance by seriously undermining the Legislature's power to advance legitimate state interests.[15] The best evidence of this is that the lead Justices presently use the precept

---

[15] The lead Justices appear to disparage such legislative choices by referring to our co-equal branch as "transient legislatures." Majority Op. at 165 (plurality in relevant part). The General Assembly is not transient, it is a fixed part of our Commonwealth's (continued…)

to conclude that the people's elected representatives are not even allowed to "encourage childbirth over abortion," to favor life over death. Majority Op. at 216 (plurality in relevant part). That is an absurd result that cannot possibly have been the intent of the drafters of Article I, Section 26, or of the voters who approved it. As such, today's ruling represents a political decision that intrudes into the legislative sphere and thereby usurps the Legislature's legitimate authority.

## IV. Conclusion

For the reasons given above, I would apply *stare decisis*, decide this appeal based on our unanimous and well-supported ruling in *Fischer*, and affirm the Commonwealth Court's order. Insofar as the majority instead overrules *Fischer*, vacates that order, and remands, I dissent.

---

government. If the adjective and use of the plural ("legislatures") are intended to convey that the Legislature's membership changes over time, that does not distinguish it from the other two branches, including this Court. Indeed, a change in this Court's membership has now led to the overruling of a prior unanimous decision of this Court. Ironically, the majority simultaneously labels as "dangerous" my adverting parenthetically to the fact that the present majority comprises three Justices whereas the *Fischer* majority consisted of seven (an observation that is allegedly also "pedestrian"). Majority Op. at 54 n.30. I submit that if anything is dangerous, it is this Court's unjustified interference with decisions made by the people's representatives concerning the appropriate use of public funds.